1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                        DISTRICT OF HAWAII

3    UNITED STATES OF AMERICA,      )    CRIMINAL NO. 04-00211DAE
                                    )
4              Plaintiff,           )    Honolulu, Hawaii
                                    )    April 25, 2005
5         vs.                       )    1:34 p.m.
                                    )
6    CURTIS WELCH,                  )    SENTENCING TO COUNT 1 OF
                                    )      THE INDICTMENT
7              Defendant.           )
     _____)

8
                        TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE DAVID ALAN EZRA,
               CHIEF UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Government:      MARSHALL H. SILVERBERG, Esq.
12                            Assistant U.S. Attorney
                              District of Hawaii
13                            Room 6100 - PJKK Federal Bldg.
                              300 Ala Moana Blvd.
14                            Honolulu, Hawaii 96813

15
     For the Defendant:       SHANLYN A. S. PARK, Esq.
16                            Assistant Federal Public Defender
                              Room 7104 - PJKK Federal Bldg.
17                            300 Ala Moana Blvd.
                              Honolulu, Hawaii 96813
18

19

20   Official Court Reporter:     Cynthia Tando Fazio, RMR, CRR
                                  United States District Court
21                                P.O. Box 50131
                                  Honolulu, Hawaii 96850
22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).

EXHIBIT "1"

1    MONDAY, APRIL 25, 2005                        1:34 P.M.

2              THE CLERK:  Criminal 04-211DAE, United States of

3    America versus defendant Curtis Welch.

4              This case is being called for a Sentencing.

5              Counsel, please state your names for the record.

6              MR. SILVERBERG:  Good afternoon, Your Honor.  Marshall

7    Silverberg on behalf of the United States.  Standing next to me

8    is Special Agent Charles Pang from ATF and behind me is Kenneth

9    Bode from the Department of Land and Natural Resources who came

10   up from Maui who is here.

11             MS. PARK:  Good afternoon, Your Honor.  Shanlyn Park

12   on behalf of Curtis Welch, who is present.

13             THE COURT:  All right.  Ms. Park, have you and your

14   client had a full and ample opportunity to read, review and

15   discuss the presentence report and file any objections you

16   deemed appropriate?

17             MS. PARK:  Yes, Your Honor, we have.

18             THE COURT:  On July 30th, 2004, the defendant pled

19   guilty to being a person convicted of a misdemeanor crime of

20   domestic violence in possession of a firearm, in violation of

21   18, United States Code, Section 922(g)(9) and 924(a).  That's

22   Count 1 of the indictment.

23             There is no plea agreement in this case.  The court

24   adopts the factual statements contained in the presentence

25   report as to which there are no objections.

1          Mr. Silverberg indicated there were no objections in
2     his submission on March the 18th of this year.

3          You filed a statement on March the 23rd of this year
4     informing that he married on 11/24/2004 and apparently has five
5     legal dependents.  And the face sheet was updated to reflect
6     that.  Paragraph -- is this the same woman to which he had the
7     domestic violence issue?

8          MS. PARK:  Yes, Your Honor.

9          THE COURT:  Now, Paragraph 6, the defendant informed
10    that the citation he was issued for improper storage of firearm
11    was dismissed.  And that was incorporated.

12         Paragraph 28, the defendant states that with regard to
13    his second revocation hearing, it was he who suggested to the
14    court that he serve 120 days and then have his probation
15    terminated.  His comments are incorporated by reference.

16         My understanding is that he was revoked again today.
17         MS. PARK:  Yes, Your Honor.  We did not admit to the
18    violations, but we did not contest the revocation of bail given
19    that he wanted to proceed with sentencing today.

20         THE COURT:  All right.  Paragraph 40, he informed that
21    in February of 2005 he injured his back.  That's been reflected
22    in the report.

23         Paragraph 41, he informed that he has been diagnosed
24    with Attention Deficit Hyperactivity Disorder and was
25    prescribed a Ritalin-like medication.  And that's been

1    reflected.

2            Paragraph 44, he informs that his experience, his

3    training and education as a heavy equipment operator have given

4    him skills similar to a structural engineer.

5            Well, I don't know about that, but his comments are

6    incorporated by reference.

7            Paragraph 46, he informs that his current gross

8    monthly income is between 2,000 and 5,000.  I assume that was

9    before he was revoked.

10            MS. PARK:  That's correct, Your Honor.

11            THE COURT:  Paragraph 46 has been amended to include

12    that.

13            Paragraph 60, he believes that his willingness to

14    assist the government in prosecuting other individuals deserves

15    some consideration, and that's incorporated.

16            Now, those are the only factual objections I received.

17            MS. PARK:  That's correct, Your Honor.

18            THE COURT:  All right.  With respect to the

19    conclusions to the applicable guidelines, the government had no

20    objection.

21            Do you still have objections you wish to argue,

22    Ms. Park?

23            MS. PARK:  Yes, Your Honor.

24            THE COURT:  All right.  You can proceed.

25            MS. PARK:  Your Honor, in regards to the six-level

1    reduction for possessing the gun for the purposes of hunting,

2    Mr. Welch would proffer to this court that he was in an area in

3    which it was proper to be hunting.  And that he went up there

4    with the purpose to teach his children about hunting and the

5    benefits of it.  He was there with Cristy Ingrisano and it's my

6    understanding through discussions with her, she informed the

7    government that that was what she thought their belief was when

8    she was in the area was to go hunting.  And we would submit,

9    Your Honor, that given his past and how he was raised in by his

10   parents to be a hunter, that this -- this reduction should

11   apply.

12             THE COURT:  Do you want an evidentiary hearing on

13   this?

14             MS. PARK:  Your Honor, we accept that he did not have

15   a hunting license.  So if that's what the offer of proof is

16   from Mr. Bode, then we don't reject that offer of proof that he

17   did not possess a hunting license.

18             THE COURT:  Mr. Silverberg?

19             MR. SILVERBERG:  Not only that, Judge, but he told

20   Officer Bode that he was not there for hunting, he was just

21   trying out the gun.  And now all of a sudden he's there for

22   hunting.  So that's a -- that's a factual statement that is not

23   supported by his earlier statement.

24             But there is no doubt he did not have a license.

25   That's not in dispute.  There's no doubt he discharged the

1    firearm.  Both of those are against state law.  You cannot

2    discharge the gun in a -- in a hunting area without having a

3    valid license, which he didn't have, and you cannot possess a

4    gun in a hunting area without a valid hunting license.

5        The gun wasn't even registered to him.  Under the

6    legal statement, the legal provision of 2K2.1(b)(2), you have

7    to have not only the intent to possess it solely for lawful

8    sporting purposes or collection, but it says, "and the

9    defendant did not unlawfully discharge or otherwise unlawfully

10   use such firearms or ammunition."  Here he unlawfully

11   discharged and he unlawfully used it by possessing it for

12   target practice or for whatever purpose he was using it there

13   without a license.

14       THE COURT:  By -- by the very prescription of the law

15   it's clear that the defendant does not fall within the

16   parameters for the two-level reduction for the very reasons

17   that Mr. Silverberg has just outlined.  He didn't -- number

18   one, he didn't have a license.  Number two, he unlawfully

19   discharged the weapon.  That alone is a disqualifier.  And then

20   you add to that his statement to the agent, which is not in

21   dispute, that he wasn't there for hunting.

22       So, under the circumstances he is not entitled to the

23   six-level reduction.

24       You also filed an objection on Paragraphs 26 to 29

25   where you asserted that the U.S. Probation Office relied on

1    police reports to establish a factual basis for the criminal

2    charge, which the defendant asserts is in violation of the

3    teachings of Shepard versus United States.

4         You further argue that the U.S. Probation Office did

5    not look at charging documents or any other judicial document

6    to determine what the facts were with respect to his prior

7    criminal proceeding.  And I assume you're talking now about his

8    conviction for domestic violence?

9         MS. PARK:  Yes, Your Honor.

10        THE COURT:  Are you still arguing that point?

11        MS. PARK:  Yes, Your Honor, we are preserving that

12   issue.

13        THE COURT:  Okay.

14        MS. PARK:  The teachings of Shepard and -- and the

15   literature that I have been reading indicates that the Supreme

16   Court is providing direction that it's improper for police

17   reports to be relied on, for a court to look at those types of

18   documents at sentencing.  And the factual basis for

19   establishing the convictions, we're not doubting that he has

20   the convictions, we're not arguing that the convictions exist,

21   what we're doing is basically preserving the issue that looking

22   at police reports and going beyond the charging document, the

23   document -- any court documents to show a conviction and

24   judgment is improper for a court to look at at the time of

25   sentencing.

1           And in regards to some of the convictions, Your Honor,
2    Mr. Welch submits that what was reported in the police reports
3    differed from testimony that was either elicited at trial or --
4    different -- people -- people subsequently made different
5    statements.  And what basically I think the teachings of
6    Shepard shows is that when a person makes an objection to those
7    types of things, this court would then have to have a
8    mini-trial to assess what really happened.  And I believe the
9    Supreme Court's direction is that that would not be proper.
10   What you need to look at is that the conviction occurred, and
11   we don't -- we don't object that the conviction occurred.
12   We're making a legal objection that what this court can rely
13   upon to determine the criminal history category is strictly
14   documents from the court and not police reports.

15           THE COURT:  Well, I believe we do have the documents
16   from the court actually.

17           MR. SILVERBERG:  That is the response from the
18   probation office, that they -- those documents -- they have the
19   documents and they are available for the court's review.

20           So, the fact that the three prior convictions -- and
21   it's not one, Your Honor, it's three.  He has -- one is an
22   Assault Third, and then there are two domestic violence
23   convictions, one involving his present wife and one involving
24   his former wife.  So it's not just the one.  And the documents
25   establish the criminal history score.

1        The police reports are used solely, as I understand

2    it, to give the court a sense as to what transpired that led up

3    to the three convictions and not to establish the convictions

4    themselves.  So to that extent Shepard certainly does not apply

5    because Shepard just said to establish the convictions for

6    someone to be an armed career criminal, you can't rely solely

7    on police reports, you have to use documents like a judgment,

8    an indictment and so forth, the very same documents that the

9    probation office used here.  The police reports here merely

10    elaborate the factual basis that led up to the convictions and

11    not establishing the convictions themselves.

12        THE COURT:  Yeah, the convictions actually had been

13    established by the court records.  Do you have the copies of --

14        MS. PARK:  Your Honor, we're not contesting that the

15    convictions were established by court records.

16        THE COURT:  So I don't understand, Ms. Park --

17        MS. PARK:  What I'm contesting --

18        THE COURT:  -- what you're arguing about.  The

19    point -- the point here is that he has been convicted because

20    he pled guilty to possession of a firearm by someone who was

21    convicted of abuse of a household member.  The very conviction

22    states Abuse of a Family/Household Member.

23        MS. PARK:  Your Honor, what we are objecting --

24        THE COURT:  So what are you objecting to that I'm

25    looking at?

1          MS. PARK:  We're objecting to the inclusion of the

2    facts of the police report, the factual basis that undermines

3    those convictions.

4          THE COURT:  That isn't -- I'm not going to sentence

5    him based on any police report.  I'm sentencing him based upon

6    his conviction and the fact that he apparently doesn't know how

7    to stay out of trouble.  He keeps --

8          MS. PARK:  Your Honor --

9          THE COURT:  -- getting revoked.

10          MS. PARK:  Your Honor, that's exactly what we wanted

11    to prevent the court from sentencing him based upon facts in a

12    police report that he -- he indicates were not proven at trial

13    or the testimony was changed at trial.  So if the court is

14    making a statement that the court is not going to sentence him

15    based upon these facts, then that was what our objection was to

16    accomplish.

17          THE COURT:  Well, I'm going to sentence him based upon

18    the fact that he was convicted of Abuse of a Family or

19    Household Member, once.  He was then convicted of Abuse of a

20    Family or Household Member again.  He was revoked, in

21    accordance with the court -- official court record now, on

22    October the 22nd of '99.  He was revoked again on 11/17/2000.

23    He was placed on probation on September the 22nd of 2003.  He

24    was put on supervised release by this court pending his

25    sentencing and now he's been revoked again.  That's what I'm

1    going to sentence him based on and whatever input I have from

2    you and your client and the government.

3         MS. PARK:  Thank you, Your Honor.  That was what our

4    objection addressed.

5         THE COURT:  In addition, by the way, he was also

6    convicted in 2003 of Criminal Contempt of Court.

7         Okay.  You want to address the court on your client's

8    sentencing?

9         MS. PARK:  Excuse me, Your Honor.  I'm sorry.

10        (Counsel and client conferring.)

11        THE COURT:  Anyway, since you've withdrawn that, or at

12   least we've resolved it, the offense level is 12, the criminal

13   history category is four, the imprisonment range is 21 to 27

14   months.  That is the range for the advisory guidelines.  The

15   statutory maximum is ten years.  And the court may sentence up

16   to the statutory maximum.  Guideline range of 27 to -- 21 to 27

17   months, as I've said.  27 months is the top of the advisory

18   guideline range.  Okay?

19        MS. PARK:  Your Honor, if I just -- I want to just

20   finish with what he was saying to me, if I may have a moment?

21        THE COURT:  All right.

22        (Counsel and client conferring.)

23        MS. PARK:  Your Honor, as this court is aware, and you

24   just said it correctly, that the guidelines are advisory, and

25   in addition to these advisory guidelines the court must

1    consider many factors.  Number one, the need to punish,

2    adequate deterrence, and to protect the public.

3          Looking at all of these factors together Mr. Welch

4    would ask this court to look at an alternative type of

5    sentence.  A period of incarceration followed by home detention

6    with the longest period of supervised release and a condition

7    that he do community service so that he can go back and assist

8    the community in which he harmed by this conviction.

9          When you look at the facts of this case and you look

10   at what happened, what led to the conviction, Mr. Welch was in

11   an area that was a hunting area.  Granted, he didn't have a

12   license, I understand that, but he did discharge the firearm in

13   a hunting area.

14         THE COURT:  Well, the crime isn't actually discharging

15   the firearm, the crime is possessing the firearm.

16         MS. PARK:  I understand that, Your Honor.  And we

17   would submit to the court that his actions of possessing it

18   wasn't a crime of violence, he was there with his family, he

19   wasn't attempting to harm the public.  He didn't brandish the

20   firearm in any way that would hurt the public.  And so we would

21   ask the court to look at those facts --

22         THE COURT:  Firing off into the bushes isn't going to

23   hurt somebody?

24         MS. PARK:  In an area that's authorized for hunting,

25   Your Honor, that's --

1          THE COURT:  Well -- all right.

2          MS. PARK:  He understands that he shouldn't have had

3    the firearm and he expects -- accepts complete responsibility

4    for that.  And we believe that he should receive punishment

5    that reflects the conduct in this case.  And we believe that

6    the punishment that he should receive could be accomplished in

7    many ways.  A period of incarceration, split that with a period

8    of home detention, community service and supervised release of

9    three years.

10          In regards to adequate deterrence, Your Honor,

11   Mr. Welch, as this court is aware through numerous letters of

12   support, was raised in a hunting family.  His family had a

13   hunting contest every year in which he participated in.  And so

14   for him hunting was a way of life.  He now truly understands

15   that that cannot be his way of life and he cannot pass that

16   trait or that skill down to his children because legally he

17   would never be able to possess a firearm.  And, Your Honor, so

18   we would ask the court to take that into consideration.

19          Your Honor, we believe that placing Mr. Welch on the

20   longest period of supervised release after the court imposing a

21   split sentence would also show the need to protect the public.

22          There's other factors in mitigation that we would

23   present to this court.  If you look at the presentence report,

24   Your Honor, Mr. Welch has had steady employment throughout his

25   life.  He worked for numerous years for 4 C Construction

14

1    Company, which is a company that is owned by his family, as a

2    back hoe operator and he recently started his own company

3    which, you know, was successful until he hurt his back and

4    couldn't work anymore.

5           He has a reputation on Maui, according to the letters

6    of support, for being one of the best operators of a back hoe

7    around.  Given that skill level, Your Honor, and the fact that

8    he has worked in the past, I think this court can be assured

9    that he will continue to work in the future and be self

10   sufficient.

11          He accepted responsibility in this case, Your Honor,

12   by pleading guilty.  In addition, he cooperated with the

13   government.  He provided the government with information on who

14   the gun actually belonged to and he did this because he didn't

15   want to associate with these people anymore and he wanted to

16   cut his ties with them.  And I think that shows and that

17   demonstrates to the government as well as to this court that he

18   doesn't want to be involved in any of this kind of activity in

19   the future.

20          Your Honor, Mr. Welch was recently diagnosed with

21   ADHD, a condition that he's had for his entire life.  And he's

22   been trying to resolve this disability and it's been very

23   difficult for him to deal with the fact that he is disabled in

24   some way and that to start taking medication to deal with that

25   disability.

1          Initially when he was placed on medication he had a
2    very negative reaction and it didn't help him at all.  And he
3    was trying to stabilize his medication over the past few weeks
4    with very limited success.
5          His ADHD, Your Honor --
6          THE COURT:  How did he stabilize his medication, by
7    taking drugs?  That's going to stabilize his medication?
8          MS. PARK:  Your Honor, there's no -- that's just an
9    allegation at this point.  There's no admission or finding by
10   the court that he was on methamphetamine.
11         THE COURT:  Well, what I have in front of me are --
12   and you can put this in the record -- his urine specimens,
13   which he finally submitted after stalling on several occasions,
14   were confirmed positive by Quest Diagnostic Laboratories for
15   amphetamine and methamphetamine and methamphetamine,
16   respectively, and he did not contest those charges and was
17   revoked based upon essentially a no contest plea.  No contest
18   plea is the equivalent of a guilty plea.
19         But even if he didn't plead guilty, it is sufficient
20   for me to find by a preponderance of the evidence that an
21   uncontested positive on a drug test is drug usage.  That's the
22   law.
23         MS. PARK:  I understand that, Your Honor.
24         THE COURT:  So that's how he was trying to regulate
25   his medication?

1          MS. PARK:  Your Honor, there are issues with that.

2   His ADHD medication would test presumptively positive given

3   that it does contain amphetamine usage in methadone and

4   Concerta.  We have issues whether the confirmation test could

5   have actually confirmed that.

6          THE COURT:  Well, then he should have contested it

7   instead of pleading no contest.

8          MS. PARK:  We didn't contest it, Your Honor, because

9   he wanted to proceed before this court for sentencing because

10  he's experiencing an extreme amount of anxiety anticipating

11  what this court will do at sentencing and he wanted to move

12  forward.

13         THE COURT:  All right.

14         MS. PARK:  Your Honor, in -- also in Mr. Welch's favor

15  he has tremendous family support.  Here present in the

16  courtroom is his wife Cristy Ingrisano and his parents.  And

17  they will continue to support him back on Maui when he is

18  released.

19         All of these factors together, Your Honor, we would

20  submit to the court, while Mr. Welch has issues that he has to

21  deal with the ADHD, would ensure that once he is released from

22  incarceration he would be able to succeed and be a positive

23  member of the community.

24         THE COURT:  Okay.  Does your client wish to address

25  the court?

1          THE DEFENDANT:  Yeah, Your Honor, I'm really -- I

2    wasn't really sure about these laws and when I did have the

3    domestic charge a long time ago, they're 15 years ago.

4          THE COURT:  Two charges.

5          THE DEFENDANT:  Well, now, yeah, I have another one.

6    Before -- the one that got me in trouble with the gun, my ex, I

7    really never was told.  So I know that ignorance isn't any

8    excuse in the law, but I really wasn't told exactly that I

9    could never have a gun before -- again, it was more I couldn't

10   have it while I was on probation, to this sort of thing, to

11   where I didn't even know that I was in this much trouble.  If I

12   would have, I wouldn't have had another gun.

13         And I'm so, so sorry for that, especially for my

14   children I have.  I have all my children and my family and my

15   business, and everything that's going so well is going to be

16   really screwed up over this thing.

17         And the other thing, I really worked hard at this

18   probation thing and that's why I went to the ADH -- why I was

19   diagnosed with this, 'cause I always have trouble remembering

20   or getting to places on time and it was really getting -- I

21   didn't want to screw up anymore.  So I went to somebody and

22   they told me this and then next thing you know they told me

23   this is what my problem is.  So I started taking these

24   medications and it did -- threw me a loop and then they changed

25   it and gradually I was getting better in the end and then they

1    told me I was urinating amphetamines, and I was like:  I don't

2    know, no, I'm just taking these pills.  And then I was going

3    back actually on Friday to tell my doctor, since it was coming

4    up on my urinalysis, that I can't be doing this, I mean I need

5    to change something.  They were going to -- they're going to

6    have -- they'll come after me.  I don't want to have problems.

7            I mean I've been on it for -- I've been taking

8    urinalysis for a few years now, from the other ones, but I've

9    never had a dirty ever.

10           So this has really rocked -- blows my world.  And it's

11   been so rough right now that, I mean, I'm practically losing my

12   hair just waiting for sentencing, to where I discussed with

13   Shanlyn today I would just assume let's get this thing taken

14   care of and just get sentencing done and I can get my family

15   and me through this without prolonging anything anymore.  I

16   think would be the best for us, the courts and everybody

17   involved.

18           THE COURT:  Okay.  You can be seated.

19           MS. PARK:  Thank you, Your Honor.

20           THE DEFENDANT:  Thank you.

21           THE COURT:  Mr. Silverberg?

22           MR. SILVERBERG:  Your Honor, I'm sitting here

23   squirming in my seat.  I can't remember a case like this in my

24   16 years in practicing before this court as an Assistant United

25   States Attorney.

1         First, when you look at the history of the defendant,
2    starting on March 24th, 1999, I don't know what he's talking
3    about 15 years ago, but by my math that's six years ago, he was
4    convicted of Assault in the Third Degree on June 3rd, 1998, he
5    received six months in jail, a year of probation.

6         Then he commits the first of two additional
7    convictions of house -- Abuse of Family/Household Member that
8    occurred -- that offense occurred on May 20th, 1999, which led
9    to the revocation of that first conviction for Assault in the
10   Third Degree.  And then he received a sentence of a year
11   probation on that one.  And then that was later revoked and he
12   received a sentence of two years probation and that was revoked
13   in 2000.  And he was resentenced to 120 days of incarceration.

14        Then he had the third offense, abuse of a family
15   member, two years of probation and technically is still on
16   probation for that charge.

17        Then -- and what they -- this -- what really gets me
18   in this case is we go before Magistrate Kurren on April 12th,
19   2005, for an order to show cause as to whether or not his
20   pretrial release should be revoked.  The basis for it was nine
21   no shows.  Nine times he didn't show up for drug testing.  His
22   explanation then, as now, that it was due to ADHD, that he had
23   trouble making commitments.  There was an e-mail message from
24   his doctor indicating that he actually bolted from the doctor's
25   office at one point.  Rather than sitting there listening to

1    his doctor, he ran away because he was afraid of being
2    sentenced in court.

3        We asked for him to be revoked.  The court gave him
4    the benefit of the doubt.  Judge Kurren says if it turns out
5    that there's one violation, no matter how minor, you're going
6    to be revoked before sentencing today.

7        The defendant stood silent when his attorney informed
8    the court -- I'm not blaming her in the slightest -- but he
9    stood silent when she made the representation that not one of
10   those nine no shows or any test for that matter had ever shown
11   positive.  That statement was true as far as it went.  The
12   defendant knew he was under the influence of methamphetamine at
13   the time.  There is a drug test on that; they have not disputed
14   it.

15       To hide behind that saying:  Well, we didn't contest
16   it, we didn't admit to it, therefore it didn't happen, the
17   defendant just stood up, and I was sitting here and listening
18   to him say that he's never tested positive for methamphetamine
19   when we have a positive drug test that they did not contest a
20   couple hours ago.  And as the court already indicated, that was
21   part of the record and that has been proven.  Otherwise, we
22   would have had the hearing right then and there with the
23   Pretrial Services officer, who is here in the courtroom and I
24   asked for him to be here for that very reason, in case this was
25   under dispute.

1           And the defendant again is giving the explanation that
2      it has something to do with his medication.  And in the
3      Pretrial Services report there's a direct quote from the
4      doctor at Quest who did the testing saying, quote, there is no
5      possibility that these will produce a positive methamphetamine
6      or amphetamine by our testing, end quote, meaning the two drugs
7      that the defendant is on, Concerta and Metadate would not
8      produce a positive methamphetamine or amphetamine by their
9      testing.  That's part of the Pretrial Services record.  That's
10     not contested.  The Pretrial Services officer has a copy of the
11     e-mails from -- from Dr. Jamber (ph. sp.) and I've shown them
12     to Ms. Park.  And if they want to have an evidentiary hearing
13     on that we're prepared at this time.

14          But, Your Honor, I have to tell you before April 12th
15     I had made a representation to the court in a written document
16     that I filed that we were going to ask for a sentence at the
17     bottom of the range.  Since what happened on April 12th and
18     then I have to tell the court I told Judge Kurren on April 12th
19     that the defendant was on something.  He was bouncing off the
20     walls in court that day.  He was barely lucid.  And then we
21     find out that there is sure enough a positive drug test based
22     upon that day.  The testing was done that day of what was in
23     his system, there's a positive methamphetamine test.

24          And to sit there silently while this whole issue was
25     being argued and debated and while his attorney is making a

1    representation that he's never tested positive, to sit there

2    knowing that he's got ice in his system at that time just

3    boggles my mind.

4        Your Honor, I ask for the court to impose the ten-year

5    sentence, the statutory maximum, because what this defendant

6    has done is commit a fraud on this court.  This is one of those

7    cases where the coverup is worse than the crime.  The

8    defendant's attitude, nine no shows and then keeping silent

9    while his attorney made a representation that he has never

10   tested positive for methamphetamine while knowing that he was

11   under the influence of methamphetamine is worse than the actual

12   offense that occurred in this case.

13       I think the court is with -- fully within its rights

14   to take that into account, especially given his past history of

15   revocation after revocation.  This defendant has not learned

16   any lesson.  And for him to stand here and say he didn't know

17   he was not entitled to possess a firearm when he had three of

18   those convictions, it's beyond belief.  Thank you.

19       MS. PARK:  Your Honor, we would ask the court to not

20   impose a ten-year sentence.  That is extremely harsh given the

21   facts of this case and what happened and what led to the

22   conviction.

23       Your Honor, if the court is going to use what happened

24   on the revocation hearing against Mr. Welch in imposing an

25   unbelievably high sentence, we would ask the court to have an

1    evidentiary hearing on that issue.

2         THE COURT:  Ms. Park, you are out of bounds.  That's

3    not a way to address the court.  If you are going to impose a

4    sentence that is extremely too high, then I want an evidentiary

5    hearing.

6         MS. PARK:  I -- I --

7         THE COURT:  I mean what kind of a request is that to

8    me?  You've been practicing law long enough to know better than

9    that.

10        MS. PARK:  I apologize, Your Honor.

11        THE COURT:  Now, if you want an evidentiary hearing,

12   request it.  Don't say to me:  Judge, if you don't do what I

13   want you to do, I want an evidentiary hearing.  That's

14   basically what you just asked me.  Judge, if you don't do what

15   I want you to do, I want an evidentiary hearing.  What kind of

16   a request is that?

17        MS. PARK:  I -- I apologize, Your Honor.  I -- I

18   misspoke.

19        What -- what I'm concerned about with, Your Honor, is

20   Mr. -- Mr. Welch took a position downstairs which is basically

21   he wanted to go forward with sentencing.  And that's what he

22   wanted to do.  And I'm concerned -- there's a lot going on with

23   him, a lot going on with the ADHD medication, there are

24   pharmaceutical -- from the pharmacy saying that there is

25   amphetamine in the -- in the medication.  And so I --

1       THE COURT:  Well, Ms. Park, the bottom line is this:
2   If your client had wished to contest the drug finding as well
3   as the contention of the doctor that the drugs that he was
4   taking legally would not produce a methamphetamine or
5   amphetamine positive on his drug test, the time and place to do
6   that was at the probation hearing, not to come up to me as the
7   district judge and say:  Judge, here's what happened.  I wanted
8   to do this, but my client wouldn't let me and now I'm telling
9   you that you can't use what he's already admitted to against
10  him because we didn't have a trial down there.  Well, why
11  didn't you have a trial?  Well, we didn't have a trial because
12  we didn't want one.
13      I mean, I feel like I'm in a Fellini movie here.
14      MS. PARK:  I -- I understand the court is in a
15  difficult position.
16      THE COURT:  No, I'm not in a difficult position.  Your
17  client is in a difficult position.  He can't plead no contest
18  downstairs, be found guilty and then come up here to me and
19  say:  I didn't do it.  I mean, it doesn't work that way.
20      MS. PARK:  Your Honor, we would submit that a ten-year
21  sentence is incredibly harsh.
22      THE COURT:  I didn't say I was going to give him a
23  ten-year sentence.
24      MS. PARK:  Thank you, Your Honor.
25      THE COURT:  But I will tell you this:  Your client is

1    completely out of control.  There's no question about that.

2    There's also no question in my mind that your client, forget

3    the positive drug test, let's just focus on the nine no shows.

4    And to blame it on attention deficit disorder?  Look, I know a

5    lot about attention deficit disorder, hyperactivity disorder,

6    bipolar disorder, all of -- I've been a federal judge for 17

7    years and I've had expert testimony here about these things

8    from the best.  And there's -- and I have people on probation

9    and you have clients, Ms. Park, who have these disorders,

10   severe, and they don't stall.

11          And further, after the first or second stall or the

12   third stall, if these problems were occurring, at any point he

13   could have and should have gone to somebody and say:  Look, I'm

14   not showing up for these tests because I have attention deficit

15   disorder and I don't want to show up for these tests.

16          Did he ever say anything to anybody?  No.

17          THE DEFENDANT:  Yes.

18          MS. PARK:  He did communicate that to the Pretrial

19   Services office, Your Honor.

20          THE COURT:  And then he proceeded not to show up

21   again.

22          MS. PARK:  And then there was difficulty in him

23   showing up, yes.

24          THE COURT:  Yes.  I mean it's a disaster.

25          THE DEFENDANT:  They weren't all because of that.  I

1    mean there was a couple that were -- I had permission to go see

2    my family.  I had permission to go see my family in Oregon and

3    I got permission to go to Oregon.  Well, the day that I left, I

4    left at noon to go to Oregon, there was a piss test.  Well,

5    they don't piss test until 2:00 to 7:00.  So I thought I had

6    permission to go to Oregon already and I was leaving before the

7    time that they did urinalysis.

8          So I got on the plane and I left.  That she said that

9    I missed the piss time, then I'm all:  How did I do that if

10   they do it from 2:00 to 7:00 and I left at noon?  And I had

11   permission.  There was two of them when I was doing the fly

12   thing.  And then my wife, we accidentally missed one call in,

13   but the rest there was.  I sent letters from my doctor.  I was

14   completely discombobulated with the new medicines that they

15   gave me because I had my back problem.  I was on -- I'm on pain

16   medication from my doctor.

17         THE COURT:  Mr. Welch, let me just tell you that you

18   are not helping yourself.

19         THE DEFENDANT:  Okay, Your Honor.  I'm sorry.

20         THE COURT:  I mean, your lawyer is only here trying to

21   argue that all of these things are because of your attention

22   deficit disorder and now you're saying:  Well, only some of

23   them.  Then the others were just because I just didn't know

24   this and then my wife did that.  Holy camoly.  Why don't you

25   just sit down, Mr. Welch.

1          I'll tell you who the victims in this case are, they

2     are not you, Mr. Welch.  It's your family.  They're the ones I

3     feel sorry for.  In particular your parents.

4          You know, being a father myself with three children,

5     about your age, I recognize that regardless of what your child

6     does, you're going to stand behind them.  You're going to

7     believe them and stand behind them.  And apparently your

8     family -- you come from a good family, you have decent parents

9     and they're standing behind you.  And I certainly appreciate

10    and honor that.

11         I'm also not anti-hunting.  I am a hunter myself.

12    When I was in Texas, when I was in school I used to go hunting

13    with my friends.  I don't hunt here, there's really no place to

14    hunt here effectively, but I used to hunt regularly with my

15    friends.  I wasn't a very good shot.  I got a much better shot

16    when I became an officer in the military, but I wasn't a very

17    good shot hunting.  But I used to go hunting and I enjoyed

18    hunting.  I enjoyed the camaraderie of it, I enjoyed getting

19    out, I enjoyed the skill.  I don't have anything against

20    hunters.  I don't have anything against legal ownership of the

21    correct firearms.  I have nothing against doing it the right

22    way.

23         What I do have something against, Mr. Welch, is abuse

24    of family members, owning weapons, violating court orders,

25    making excuses which are not just not believable, but quite

1    frankly incredible.  Your behavior toward the judicial system

2    is, to say the least, contemptuous.  Your lack of respect for

3    order is gross and quite frankly you are very, very fortunate,

4    Mr. Welch, that I am a measured man.  Because if I wasn't, I

5    would have no problem imposing a ten-year sentence on you.

6    Because I think, quite frankly, you're dangerous.  You're

7    dangerous to yourself and you're dangerous to others around

8    you.  You've committed several acts of violence and you haven't

9    been able to control yourself.

10         Now, I recognize that you have Attention Deficit

11    Hyperactivity Disorder in some form or other.  But that's no

12    excuse for what you've engaged in.  Millions and millions of

13    people have that disorder.  It's not uncommon at all.  And

14    people don't go around beating up their wives.

15         THE DEFENDANT:  I --

16         THE COURT:  Don't tell me you didn't do it.  Please.

17    The fact is you did.  You were convicted of it, then you got

18    reconvicted again.  And you had several brushes with

19    contemptuous behavior of the court and you got your probation

20    revoked.

21         You just have a real hard time, Mr. Welch, with

22    authority.  You have a very difficult time understanding that

23    the rules apply to you.

24         Now, if you are truly a gun owner and appreciate guns,

25    people who appreciate guns and are true gun owners understand

1    the legal ramifications of ownership.  They understand that

2    they don't possess guns that are not lawfully and legally

3    registered.  One of the major tenets of the National Rifle

4    Association is the registration, appropriate registration of

5    legal weapons.  You're running around with an unregistered

6    firearm, shooting it off.  Now, that's just not acceptable.

7           And then you compound it.  I mean I don't blame

8    Mr. Silverberg.  He was ready, willing and able to recommend a

9    very reasonable sentence for you and then you blow it.  And

10   then he recommends a sentence, I think out of some fit of

11   passion here at the moment after being somewhat disturbed by

12   your presentation here, that would be, I think, excessive.

13          So I'm not going to sentence you to ten years.  I'm

14   not going to sentence you to anything like ten years.  But I'll

15   tell you what, Mr. Welch, I am going to sentence you to three

16   years because you deserve and need three years so that we can

17   get you into a drug rehabilitation program and we can get you

18   into mental health and mental counseling so that you can come

19   back and be a productive citizen and so you don't end up behind

20   bars for the rest of your life.  Because you are now in

21   criminal history category four.  The next crime will put you in

22   criminal history category five and you now have a firearms

23   conviction.  You're looking at a statutory maximum, the next

24   time around, of probably 20 to life.

25          So, the bottom line here, Mr. Welch, is that we need

1    to get you in treatment, we need to get you to put together --

2    the worst thing I could do is do what your lawyer recommended,

3    and that is to send you back into the community.  Because with

4    your record, you simply can't control yourself in the

5    community.

6           First of all, it would be a departure downwards from

7    the guidelines, and there's no way in the world your record

8    justifies a departure downward.  Justifies a major departure

9    upward.  I'm giving you a very measured sentence at 36 months.

10    That's really the low end of what you should get.

11           Because I don't want you out there getting angry at

12    your wife over something, getting back into, quote, unquote,

13    your medication, stalling out again.  I mean talking to the

14    probation officer and then stalling out after you talk to the

15    probation officer.  That shows a real amenability to conform

16    your behavior appropriately.  And I'm supposed to believe that

17    I'm supposed to let you out after a short sentence so you can

18    do this again?  No way in the world.  It's not happening,

19    Mr. Welch.

20           You have got to get treatment.  You have got to get

21    appropriate care and you've got to get your life together again

22    so that you can be a productive citizen.  You have substantial

23    responsibilities.  Don't you have five children?

24           THE DEFENDANT:  Yeah, I have custody of two, three of

25    them.

1          THE COURT:  Are you in a condition today to take care
2     of even one child?
3          THE DEFENDANT:  Yes, I am a very good father.
4          THE COURT:  Oh, jeez.
5          THE DEFENDANT:  The courts -- the courts --
6          THE COURT:  Mr. Welch, you are not -- you are not in a
7     position to take care of anybody today.  We need to get you in
8     a position where you can a take care of yourself.  You can't
9     even take care of yourself today.
10          THE DEFENDANT:  I'm a good father, Your Honor.
11          THE COURT:  Mr. Welch, if I thought that you were an
12     inherently bad person, I would sentence you to seven, eight,
13     ten years.  I don't think you're an inherently bad person.  I
14     think you're a guy that just got off on the wrong track.  I
15     think that you made some bad mistakes.  I think you're taking
16     some stuff you shouldn't be taking.  I think you need help.
17     And I think that you're an inherently decent guy.
18          I don't think you're an inherently bad person,
19     Mr. Welch.  You come from a good family.  But I'm not doing you
20     or your family one shred of good by simply placing you out into
21     the community so that you can get back here again on a
22     revocation where I'm going to be compelled to send you to jail
23     for seven or eight or nine years.  I don't want to send you to
24     jail for a decade.  And you're not in a position to prevent me
25     from doing that because you will not follow the rules.  You

1    cannot follow the rules.

2          I know you want to do the right thing.  I honestly

3    believe that, Mr. Welch, today.  But you're not capable of it.

4          So I am going to sentence you to a sentence and I'm

5    going to send you to treatment, where you can get treatment and

6    hopefully you can get your life back together again.  Because

7    that's what has to happen.  So that you can be a good husband,

8    you can be a good father, you can be a good son, and you have

9    every reason to be so.

10          I'm not imposing this sentence for any vindictive

11    purpose.  I'm imposing it because it's the minimum amount of

12    time I can given you and still get you into these programs that

13    I need to have you get into so that you can come back whole

14    again.  Do you understand me?

15          THE DEFENDANT:  Yeah.  Yes, Your Honor.

16          THE COURT:  All right.  Pursuant to the Sentencing

17    Reform Act of 1984, it is the judgment of the court the

18    defendant Curtis Welch is committed to the custody of the

19    Attorney General of the United States, or his authorized

20    representative, to be imprisoned for a term of 36 months.

21          After he has completed the term of imprisonment he

22    must serve a three-year term of supervised release.  During the

23    term of supervised release he is to abide by the following

24    conditions:

25          He must observe the standard conditions of

1    supervision.

2            He must not commit any federal, state or local crimes.

3            He must not possess any illegal controlled substances.

4            He must refrain from the unlawful use of a controlled

5    substance and he must undergo random drug testing.

6            He shall not possess a firearm, ammunition,

7    destructive device or other dangerous weapon.

8            He shall cooperate in the collection of DNA as

9    directed by the probation officer.

10            He shall participate in a substance abuse program as

11    I've indicated.

12            He is prohibited from possession and use of any

13    alcoholic beverage.

14            He shall participate in an approved program for

15    domestic violence.

16            He shall provide the probation office and the

17    financial litigation unit of the U.S. Attorney's Office access

18    to any requested financial information.

19            The probation office has requested that I give you a

20    fine of $3,000; however, I am not going to impose a fine in

21    this case because I believe a fine would be an unnecessary

22    burden on your wife and your family.  So I'm not going to

23    impose a fine.

24            You must submit your person, residence, place of

25    employment or vehicle to a search conducted by the U.S.

 1    Probation Office at a reasonable time and in a reasonable

 2    manner based upon reasonable suspicion of contraband or

 3    evidence of a violation of a condition of supervision.  Failure

 4    to submit to a search may be grounds for revocation.  And you

 5    must warn any other resident of the premises that you reside

 6    that you are subject to such a condition.

 7            You must also pay the United States a special

 8    assessment of $100.

 9            Now, because you did not plead guilty pursuant to a

10    plea agreement, you have your full rights of appeal, Mr. Welch.

11    You have the right to -- yes, Mr. Welch?

12            THE DEFENDANT:  I was just going to say, I was on

13    probation with the State and I did do anger management, too.

14    So...

15            THE COURT:  It didn't work.  We need to put you --

16            THE DEFENDANT:  I just finished it.

17            THE COURT:  Oh, great.  We need to get you into an

18    anger management program, okay?  And that's not an anger

19    management program that I'm putting you in.  The domestic

20    violence program is much more than that.  This is the federal

21    not the State court.

22            THE DEFENDANT:  All right.

23            THE COURT:  We have very different programs.  All

24    right.

25            Now, where was I before I answered Mr. Welch's

1    question?

2        Oh, I advise you of your right to appeal.  You have

3    the right to appeal both your sentence, okay.  You don't have a

4    right to appeal your conviction, which you pled guilty, but you

5    do have the right to appeal your sentence by filing a Notice of

6    Appeal within ten days of the entry of judgment.  If you don't

7    have the assets to pay for all or part of the costs of an

8    appeal or the services of a lawyer to assist you with your

9    appeal that would be provided with the court -- by the court.

10   Do you understand?

11       THE DEFENDANT:  (Nods head up and down).  Yeah.

12       THE COURT:  Okay.  Where -- let's see now, Mr. Welch's

13   parents live on Maui; is that right?

14       MS. PARK:  That's correct, Your Honor.

15       THE COURT:  All right.  See, we can't -- I'm going to

16   address myself to his parents now for just a moment if I may.

17       I can't send him to the Federal Detention Center here

18   in Honolulu for three years because it's too long a term.  I

19   would prefer to do that if I could so that you could visit him

20   here, but unfortunately, because this is a Federal Detention

21   Center, they won't accept him for over two years.  But more

22   important than, that the important programs that I want him to

23   get involved in are not available there.  And I want him to

24   undergo work at a significant mental health facility to help

25   him with his problems and the anger that he has and other

1    issues that he has.

2              These are programs that if he were to be in the
3    private sector would be exceptionally expensive.  But they have
4    accredited psychologists and psychiatrists in the federal
5    system that will help him and hopefully help him get through
6    the issues that he's got and treat any disorder that he might
7    have.  And I want him to be treated appropriately.  So I'm
8    going to have to have him go to the Mainland and the question
9    is where on the Mainland.

10             Have you discussed that with him at all, Ms. Park?
11             MS. PARK:  Yes, I have, Your Honor.  Sheridan, Oregon.
12             THE COURT:  Okay.  I'm sorry?
13             THE DEFENDANT:  That's where my family, where I'm
14   from, Oregon.

15             THE COURT:  Is that where you're from, Oregon?
16             THE DEFENDANT:  Yeah.

17             THE COURT:  All right.  You know where Sheridan is
18   then.  All right.

19             THE DEFENDANT:  I don't know exactly where Sheridan is
20   then.

21             THE COURT:  Well, I know, but it's not important that
22   you know, it's important that your parents know because they're
23   going to take you there, but they've got to find their way
24   there.

25             Well, Sheridan is, fortunately, a relatively new

1    facility and they have a minimum security facility there, which

2    is what I'm going to recommend for him.  I'm not going to

3    recommend that he go into a high security prison because he

4    doesn't need a high security prison.

5           Okay.  I'm going to be recommending drug treatment,

6    mental health treatment, vocational training for you and also

7    any educational opportunities that you be allowed to

8    participate in.  All right?

9           And I will recommend Sheridan, Oregon at the minimum

10   security facility.

11          Now, if there's no room at Sheridan in a minimum

12   security or a prison camp for him, then they may transfer him

13   to a different facility.  But I would rather have him go to a

14   minimum or less security facility rather than go into a medium

15   security facility, which is a facility where there are some

16   fairly hardened criminals.  So, if they can't accommodate him

17   at Sheridan, they may send him someplace else, but the

18   importance is that he go to a lesser security facility rather

19   than a higher security facility because he is not a hardened

20   criminal.  We don't want to put him in there with murderers and

21   multi-quantity drug dealers and those kinds of people.

22          So I hope you understand that they may not send him

23   there, but if they don't it's so they can accommodate him at a

24   better facility so he can get treatment.

25          All right.  Is there anything else?

1           MS. PARK:  No, Your Honor.  Thank you.

2           THE COURT:  All right.

3           MR. SILVERBERG:  No, Your Honor.

4           THE COURT:  All right.  I hope -- is it Mr. and

5    Mrs. Welch?  I hope that you understand.  I know that you're

6    not happy today, but I hope that you appreciate and understand

7    that I'm trying to help your son.  I've been here a long time

8    and I've seen these things.  And as a parent, I mean I can

9    fully appreciate that it's very difficult to accept that your

10   son would go to jail and it might actually be good for them.

11          But I can tell you that I've had many instances of

12   situations very much like your son's where they have come back

13   from the proper treatment, and I watch very carefully to make

14   sure that these things are followed up on.  I don't just

15   sentence people and let them go off and forget them.  I have

16   them come back.  They regain their life.  They're like new

17   people.  And right now I think that you recognize that this is

18   not the son that you raised sitting here.  This is a young man

19   that's got some issues that need to be taken care of so that he

20   doesn't get into real trouble.  And I don't want him to get

21   back on Maui and have a confrontation with a Maui police

22   officer and be shot dead.  And unfortunately, we had that case

23   not long ago.  We don't need that case here.  And some of these

24   young police officers -- well, we just don't need to have that

25   happen.

1          So I think that -- I'm trying to do what is best for

2    him and I hope and appreciate the fact that some day maybe

3    you'll understand what I'm doing.  And I hope that it'll work

4    out for him.  I'm very sorry for you.  I know how painful this

5    is for you.

6          Mr. Welch, I'm going to let you give your parents each

7    a hug before you go downstairs, if you like, and your wife.

8    Okay?  So you can come up one at a time if you will.

9          MR. SILVERBERG:  May we be excused, Your Honor?

10          THE COURT:  You may.

11          MR. SILVERBERG:  Thank you.

12          (The proceedings concluded at 2:29 p.m., April 25,

13    2005.)

14

15

16

17

18

19

20

21

22

23

24

25

40

1                       COURT REPORTER'S CERTIFICATE

2

3           I, CYNTHIA TANDO FAZIO, Official Court Reporter,

4     United States District Court, District of Hawaii, Honolulu,

5     Hawaii, do hereby certify that the foregoing pages numbered 1

6     through 39 is a correct transcript of the proceedings had in

7     connection with the above-entitled matter.

8

            DATED at Honolulu, Hawaii, August 2, 2005.

9

10

11                            _____/s/ Cynthia Tando Fazio_____

12                            CYNTHIA TANDO FAZIO, RMR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25